NO. 4-06-0235          Filed 10/29/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

DORIS DUKES, Individually and as Special ) Appeal from
Administratrix of the Estate of MERLON   ) Circuit Court of
DUKES, Deceased,                         ) McLean County
        Plaintiff-Appellee,             ) No. 04L79
        v.                              )
PNEUMO ABEX CORPORATION, ILLINOIS        )
CENTRAL RAILROAD, METROPOLITAN LIFE      )
INSURANCE COMPANY, and OWENS ILLINOIS,   )
        Defendants,                     )
        and                             ) Honorable
HONEYWELL INTERNATIONAL, INC.,           ) Charles G. Reynard,
        Defendant-Appellant.            ) Judge Presiding.
_____

JUSTICE KNECHT delivered the opinion of the court:

Plaintiff, Doris Dukes, individually and as special administratrix of the estate of Merlon Dukes, sued defendant, Honeywell International, Inc. (Honeywell), and several others to recover damages for harm Dukes suffered resulting from exposure to asbestos-containing products. In October 2005 a jury returned a verdict for plaintiff and against defendant, Honeywell, which appeals, arguing the trial court erred by (1) allowing into evidence a prior nolo contendere plea by defendant's predecessor Bendix, (2) allowing into evidence a letter by one of Bendix's employees, (3) allowing into evidence activities of alleged coconspirators, (4) allowing into evidence trial or deposition testimony from cases where defendant was not a party, (5) allowing into evidence defendant's membership in trade organizations, (6) giving a missing evidence instruction, (7) giving an issues instruction inconsistent with plaintiff's burden of proof, (8)

refusing to give a sole-proximate-cause instruction, (9) giving an erroneous conspiracy elements instruction, (10) giving a misleading agency instruction, (11) improperly responding to a jury question, (12) denying defendant's motion for a new trial, (13) denying defendant's motions for directed verdict and judgment n.o.v., and (14) denying defendant's motion to return certain documents produced in discovery. We reverse.

## I. BACKGROUND

Dukes was employed at the Union Asbestos & Rubber Company (Unarco) plant in Bloomington from 1954 to 1961. He was exposed to asbestos while working at Unarco. Dukes was diagnosed as having mesothelioma in early 2004, and he died May 20, 2005. This suit was brought originally by Merlon and Doris Dukes in June 2004, and after Merlon's death, Doris Dukes was substituted plaintiff as special administratrix of Merlon's estate.

In 1985, Allied Corporation purchased Bendix. Later, Allied Corporation changed its name to Allied Signal, Inc., and in 1999 changed it to Honeywell International, Inc. There is no direct connection between Bendix and Dukes, but Honeywell, under plaintiff's theory, as a successor to Bendix, bears legal responsibility for Bendix's participation in a conspiracy with other companies that supplied or used asbestos in their products.

Bendix's product line included automobile and truck brakes. Bendix used asbestos in its brake linings and other friction products at least as early as the 1930s. For many decades, Bendix purchased asbestos from Johns-Manville (J-M), the

biggest United States asbestos company and the leading miner of asbestos. Bendix manufactured brake linings at plants in Troy, New York, beginning in 1939 and in Cleveland, Tennessee, beginning in 1964. Some brake work was also done at other Bendix plants and at Bendix's Canadian subsidiary in Windsor, Ontario, prior to that plant's closing in 1980.

Bendix never employed Dukes, and no evidence shows any Bendix product was ever used in the Unarco plant where Dukes worked. Plaintiff's theory is defendant and others, including Unarco, engaged in the following conspiracy: (1) they agreed to positively assert it was safe for people to work with asbestos, (2) they agreed to suppress information about the harmful effects of asbestos, (3) one or more of the conspirators performed an overt act in furtherance of the conspiracy, and (4) the agreement and acts in furtherance were a proximate cause of Dukes' death.

During the time period Dukes worked at the Bloomington Unarco plant, (1) asbestos fibers were released into the air at the plant, (2) some of those fibers came from products manufactured by J-M and Raybestos-Manhattan (Raybestos), and (3) Dukes developed mesothelioma as a result of his exposure to asbestos at the Unarco plant. Former employees at the Unarco plant testified to the extremely dusty conditions at the plant when Dukes was employed there.

Testimony was presented as to the acceptable level of exposure to asbestos fiber dust in the air. The standards promulgated by the Occupational Safety and Health Administration

- 3 -

(OSHA) beginning in the early 1970s have steadily decreased, and medical experts testified zero exposure was the only truly safe level.

Much of the evidence presented by plaintiff related to events prior to Dukes' exposure to asbestos and did not involve Bendix. Dr. Barry Castleman, plaintiff's expert, testified during the 1930s and 1940s, J-M and Raybestos attempted to suppress asbestos research conducted by Saranac Laboratory (Saranac) and during the 1930s, J-M and Raybestos attempted to prevent Asbestos magazine from publishing information regarding asbestosis.

In 1936 Saranac, Unarco, J-M, Abex, Raybestos, and Metropolitan Life (Met Life) reached an agreement the companies would retain control over asbestos research they funded, including publication decisions. Unarco, J-M, Abex, Raybestos, and Met Life commissioned Saranac to conduct a study of asbestos, but they retained control over the study. When Saranac's 1948 report showed findings of cancer and tumors, those companies forced Saranac to remove the references before publication.

In 1935, the general counsel of J-M convinced a researcher, Dr. A.J. Lanza, to downplay the dangers of asbestosis in an industry study. That same year, the editors of Asbestos magazine proposed a story on asbestosis, but Raybestos and J-M executives objected to the story, and it was never published. Moreover, these same companies convinced the magazine not to publish any articles about the danger of asbestos until 1969.

Despite their knowledge of the findings in the various studies that had been done about the health consequences of asbestos exposure, Unarco, J-M, Raybestos, and Abex did not change any of their business practices concerning asbestos or issue any warnings to their employees. J-M knew a large segment of its workforce had asbestos-related diseases but intentionally kept this information secret from the employees.

There was also evidence concerning the activities of Owens Corning (OC) and Owens-Illinois (O-I). This included the fact O-I received a report from Saranac in 1948 concluding O-I's asbestos-containing Kaylo pipe insulation product was potentially hazardous and "capable of producing asbestosis." Despite this report, O-I and OC continued to sell Kaylo and later distributed a brochure advising Kaylo was "non-irritating to the skin and non-toxic."

A January 1942 internal memorandum detailing OC's strategy for 1942 proposed collecting articles identifying asbestos as a cause of asbestosis as a "weapon-in-reserve" for possible use in negotiations with the employees' union.

OC purchased Unarco's Bloomington plant in 1970 and continued to operate the plant with dangerous asbestos dust conditions even though OC knew asbestos dust levels at the plant were unsafe and many of its employees at both its Berlin, New Jersey, plant and Bloomington plant actually had asbestosis or other asbestos-related diseases. Despite this knowledge, OC issued no warnings to its employees concerning dangers of asbes-

tos.  OC and O-I bought a significant amount of raw asbestos fibers from J-M.

Evidence was also introduced of the many historical publications and studies of asbestos beginning around 1900.  By 1965, close to 1,000 publications had addressed the ability of asbestos to cause asbestosis, lung cancer, and mesothelioma.

J-M first put a warning on its asbestos products in 1964.  In 1968, it advised its business customers it would soon place a warning label on its shipments of raw asbestos stating: "Persons exposed to this material should use adequate protective devices as inhalation of this material over long periods may be harmful."

In 1969, J-M sent a position paper about asbestos and health to its customers, including Bendix, stating a finished product containing asbestos presented no risk but expressed concern about employees having long-term exposure to asbestos dust contracting asbestosis, a nonmalignant lung disease.  The paper further noted medical studies had reported a link between asbestos and cancer and reports of mesothelioma.

The primary trial witness with knowledge of Bendix's activities was Joel Charm, an employee of Allied Corporation when it acquired Bendix.  Charm was in charge of reviewing all of Bendix's product lines before the purchase of Bendix was completed in 1985.  He determined Bendix instituted dust-control measures and offered respirators to its employees in the 1940s and began giving its employees chest X-rays in the 1950s.

Bendix's early concern was not specific to asbestos but to general nuisance dust generated by the grinding process that occurs during the manufacturing of brakes. Bendix noted in a 1970 union brochure 15 tons of dust were generated per day at its Troy, New York, plant.

Charm also admitted, however, Bendix would have known in the 1950s lung scarring could occur as a result of exposure to its plants' dust. The earliest communication he saw of written communication to Bendix's employees of the dangers of asbestos was in March 1978. Charm contended there must have been some oral communication to the employees in the early 1970s in conjunction with the announcement of standards by OSHA.

As early as the 1930s Bendix received correspondence from Met Life concerning the issue of lung disease from inhalation of asbestos dust. Documents generated by Bendix in the 1970s touted Bendix's long-standing knowledge about asbestos.

Bendix endeavored to meet the OSHA standards published in 1972. It monitored asbestos levels throughout its plants and installed additional dust-control equipment. As OSHA standards increased, so did Bendix's dust-control programs. In 1973, Bendix began putting labels on its products that stated the products contained asbestos and warned against creating dust while installing the brake shoes because breathing asbestos dust may cause "bodily harm." During this time when OSHA held hearings on asbestos standards, J-M advocated to OSHA any required labels leave out the word "cancer" as it would "have a very

severe" and "undeserved economic impact on the industry."  The Asbestos Information Association (AIA), of which Bendix was a member, likewise argued against the words "asbestosis" and "cancer", claiming "such a label would surely spell the demise of a number of major product lines of the industry."

In 1973, Bendix distributed a bulletin to customers requesting they comply with all OSHA regulations and recommending (1) all operators of grinders be supplied with and wear protective equipment and (2) caution signs be displayed.  The bulletin also stated, "One cannot dispute that exposure to asbestos dust of high enough intensity and long duration constitutes a cause related to asbestosis and/or cancers."

In 1975, Bendix's internal studies concluded none of its employees had suffered from asbestos-related disease.  Bendix also concluded the type of asbestos it used was less risky than other types of asbestos but no safe level of exposure for any type of asbestos was proven.  Defendant's current medical director testified all forms of asbestos were capable of causing mesothelioma, lung cancer, and asbestosis.

In 1976, Bendix engaged Stanford Research Institute (SRI) to do a morbidity study of employees who had worked at the Troy brake-lining manufacturing plant from 1937 to 1975.  The study found no relationship between plant employment and deaths from diseases associated with asbestos exposure.  The study results were sent to Bendix's then-current employees in 1978 with the admonition the study did not refute the thesis that in some

work environments and manufacturing processes a relationship appeared to exist between asbestos and certain forms of cancer. SRI did a follow-up study five years later and found no asbestos-related disease had caused any deaths in the Troy work force.

In 1982, the Ontario Ministry of Labor undertook a similar mortality study with respect to the work force at Bendix's former plant in Windsor. The study, also updated five years later, reported two possible deaths due to mesothelioma but concluded overall it was not possible to demonstrate an association between working in an asbestos-using department and the risk of asbestos-related disease. However, a 1981 Toronto newspaper article claimed 13 people had died of asbestos-related cancer at Bendix's Canadian plants and stated there was concern Bendix had not adequately complied with a 1966 government request to clean up its plants.

In 1947, Bendix, 20 other companies including J-M, Abex, and Raybestos, 53 individuals, and a trade association (the Brake Lining Manufacturers Association (BLMA)) were indicted in federal court and charged with unlawfully conspiring to fix prices, terms, and conditions of sale of brake linings in violation of federal antitrust laws. In 1948, each party, including Bendix, entered a plea of <u>nolo</u> <u>contendere</u>, confirmed on the record the practices charged in the indictment had been abandoned, and agreed not to resume such practices in the future.

During pretrial motions <u>in</u> <u>limine</u>, the trial court first ruled evidence of the <u>nolo</u> <u>contendere</u> plea would not be

- 9 -

admitted but indicated a willingness to reconsider. During trial, plaintiff requested to use evidence of the plea, and the trial court, acknowledging defendant's objections were "not unreasonable" and were "credible positions," nonetheless changed its ruling. Documents pertaining to the nolo contendere plea were admitted into evidence but not submitted to the jury. Instead, the court read to the jury a "limiting instruction," which included the substance of the documents over defendant's objection.

In 1966, E.A. Martin, director of purchases for Bendix's Troy plant, wrote a letter to Noel Hendry, sales manager at J-M, in which he included an article from the September 1966 edition of Chemical Week magazine that asserted the United States Public Health Service had determined 40% of Americans had mild, chronic cases of asbestosis even though they never worked directly with asbestos and while the average asbestos worker was well-protected, the man on the street was not. Martin went on to say, "My answer to the problem is: if you have enjoyed a good life while working with asbestos products why not die from it. There's got to be some cause." Hendry sent a reply thanking Martin for the "101st" copy of the article he had received and stated further, "I suppose we have to bear with people who have nothing better to do than create alarm, but we are not alarmed and we live and sleep with the stuff." He also noted Chemical Week was printing a retraction and the United States Public Health Service was mad because it had been misquoted.

All of defendant's witnesses described Martin's remark about dying from asbestos as a personal comment which was "stupid," "in very bad taste," and "unconscionable." They also stated it was contrary to the views of Bendix and Honeywell management. Over defendant's objection, no evidence was presented showing Martin had the authority to speak for Bendix on any issue of health and safety or the letter was ever ratified or approved by a person with such authority. The trial court allowed the letter into evidence in its entirety as an admission by defendant.

The trial court also admitted the rest of Martin's file into evidence over defendant's objection. It included a memo dated October 18, 1966, from Martin to management and safety personnel at the Troy plant advising a later issue of Chemical Week included letters refuting the previous article. Martin added "[t]his may help to quiet the fear that was aroused by Dr. Selikoff's stigmatic report on 'Lung Cancer From Asbestos,'" and he advised the purchasing department keep a file on the subject. This file contained newspaper articles from 1964 and 1966 describing Dr. Selikoff's report, and among others, a 1949 report of the Canadian Health Department concerning deaths from tuberculosis and other causes from 1943 to 1947 in cities where Canadian asbestos mining occurred.

Over defendant's objection, plaintiff introduced evidence J-M and Bendix shared a common director from 1959 to 1967. No other evidence pertained to the director or any

asbestos-related actions taken by the board of directors by either company during that time period.

Again over defendant's objection, plaintiff introduced evidence demonstrating Bendix's membership in the Friction Materials Standards Institute (FMSI) and the AIA, as well as extensive evidence concerning the formation, general membership, and activities of the FMSI. FMSI is a trade association of companies involved in the friction-materials business incorporated in 1948 using the same offices and same secretary as the BLMA, which was dissolved at the time of the 1948 price-fixing nolo contendere plea. The members of FMSI and BLMA were not identical, but there was considerable overlap. Most of the companies alleged as coconspirators here were members of both associations.

Plaintiff also presented evidence of activities undertaken by FMSI and AIA representing the industry position on legislation and governmental regulations concerning the asbestos industry.

At the close of plaintiff's case, defendant moved for a directed verdict on the conspiracy charge. The trial court denied the motion, finding sufficient evidence of parallel conduct and also sufficient additional evidence of an agreement to satisfy the standards of McClure v. Owens Corning Fiberglas Corp., 188 Ill. 2d 102, 720 N.E.2d 242 (1999). The court stated the additional evidence may have been less in a "quantitative sense" than that found insufficient in McClure but it was stron-

- 12 -

ger in a "qualitative sense," noting the existence of a common director, opportunity to associate through industry association meetings, the arguable "close relationship" with J-M evidenced by the E.A. Martin letter, and the 1948 nolo contendere plea.

On October 3, 2005, the jury found for plaintiff and assessed damages of $1 million for losses sustained by Dukes during his lifetime, $3,675,000 for the wrongful death of Dukes, and $500,000 for losses sustained by Doris Dukes.

On October 19, 2005, defendant filed a motion for the return of post-2002 lobbying documents it was required to produce to plaintiff in discovery. On November 1, 2005, defendant filed a posttrial motion for judgment n.o.v. or, alternatively, a new trial. The trial court denied all of those motions, and this appeal followed.

## II. ANALYSIS

### A. Inadmissible Evidence

A trial court's admission of evidence is reviewed under an abuse-of-discretion standard (Leonardi v. Loyola University of Chicago, 168 Ill. 2d 83, 92, 658 N.E.2d 450, 454-55 (1995)), unless the admission of evidence was based on the court's interpretation of law; then review is de novo. Petre v. Kucich, 331 Ill. App. 3d 935, 941, 771 N.E.2d 1084, 1089 (2002).

#### 1. Nolo Contendere Plea

Documents pertaining to Bendix's 1948 plea in a federal price-fixing case were admitted in evidence but not given to the jury. Instead, the trial court summarized the factual content of

the documents in a "limiting instruction" advising the jury of the price-fixing charges giving rise to the plea and the judgment of conviction entered on the plea.  In addition, court's instruction No. 1 was given to the jury during the jury-instruction phase of trial, but it contained no specifics concerning the prior conviction, unlike the "limiting instruction" orally given to the jury during the evidence portion of the trial.

The limiting instruction given during the evidence portion of the case stated:

"Ladies and gentlemen, the [c]ourt has reviewed documents offered by the [p]laintiff from which the following information is furnished to you as evidence for your consideration:

In 1947 the following corporations, in alphabetical order, plus 12 others, were indicted for conspiracy in restraint of trade and commerce in brake linings: American Brake Shoe Company; Bendix Aviation Corporation; Brake Lining Manufacturers' Association Incorporated, Gatke Corporation; Johns-Manville Corporation; Raybestos-Manhattan Incorporated.

The indictment charged that Brake Lining Manufacturers' Association, Inc., Association [sic] was a trade association whose members

- 14 -

were manufacturers of friction materials including brake linings.

That each of the defendants, during all or part of the period covered by the indictment, had been engaged in selling brake linings and had been and was a member of the association.

That beginning sometime in 1927, and continuing thereafter up to and including the date of the indictment, the defendants and other persons and corporations unknown to the grand jurors unlawfully combined and conspired to fix, establish, maintain, control, manipulate[,] and tamper with the prices, terms[,] and conditions in the marketing of brake linings in restraint of interstate trade and commerce.  That the combination and conspiracy was a continuing one.

On September 22, 1948, each of the charged corporations entered pleas of nolo contendere, no contest, to these charges.

Facts concerning the activities relating to the above charges were recited to the [c]ourt, and all of the defendants confirmed the factual statement.

The defendants were adjudged by the

[c]ourt to be guilty as charged, were convicted, and were sentenced.

At the time of their being sentenced, the defendants presented to the [c]ourt a [c]ertificate of [v]oluntary [d]issolution of the Brake Lining Manufacturers' Association, Inc[.], and the defendants confirmed on the record that they had abandoned all the practices charged in the indictment, and that they would not resume any of such practices in the future.

The evidence which was just related to you concerning a conspiracy other than that alleged in the complaint is being received for the limited purpose of considering [Honeywell's] motive, opportunity, common plan or design, or absence of mistake or accident.  It may be considered by you only for that limited purpose.  It is for you to determine whether the [d]efendant Honeywell was involved in that conduct.  And, if so, what weight if any should be given to this evidence on the issue of motive, opportunity, common plan or design, or absence of mistake or accident."
A condensed version of this instruction was given to

- 16 -

the jury as a jury instruction (court's instruction No. 1):

> "Evidence has been received that the [d]efendant Honeywell has been involved in a conspiracy other than that alleged in the complaint.  This evidence has been received on the issue of the [d]efendant Honeywell's motive, common plan or design, opportunity, or absence of mistake or accident and may be considered by you only for that limited purpose.  It is for you to determine whether the [d]efendant Honeywell was involved in that conduct and, if so, what weight, if any, should be given to this evidence on the issue of motive, common plan or design, opportunity, or absence of mistake or accident."

Plaintiff contends this evidence is relevant because it specifically alleged the conspirators knew if they adequately warned of asbestos risks, "publication of such warning would cause workers to leave those industries using asbestos and therefore reduce the sale and usage of asbestos," which would decrease profits for the companies involved.  For companies like Bendix and Abex, virtually the only products they manufactured using asbestos were brake linings, referred to as "friction materials."  For others, like J-M and Raybestos, brake linings were an important segment of their manufacturing.  Defendants in the price-fixing case included Bendix, Abex, J-M, and Raybestos.

The indictment alleged each of these companies conspired for more than a decade to fix prices. This was done presumably to increase the companies' profits.

Plaintiff contends Bendix had been convicted of participating with a number of the same companies with the same products during the same period of time as plaintiff alleges this conspiracy for the suppression of health information began. Plaintiff acknowledges, with the exception of not-for-profits, corporations seek to increase revenues and maximize their bottom line but argues "hopefully" the subset of companies willing to engage in illegal conduct to maximize their bottom line is small. Plaintiff argues the fact Bendix, J-M, Abex, and Raybestos were all convicted of falling within that subset by conspiratorial misconduct in the marketing of asbestos products is relevant when allegations exist they entered into another separate conspiracy to protect their market for asbestos products.

Defendant contends evidence of Bendix's <u>nolo contendere</u> plea to another unrelated conspiracy is inadmissible here. While <u>nolo contendere</u> pleas are not generally a part of Illinois practice (see 725 ILCS 5/113-4.1 (West 2004)), they do act as a guilty plea although the defendant may still deny the facts underlying the plea in a subsequent proceeding. <u>Gerdes v. Edgar</u>, 148 Ill. App. 3d 646, 648, 499 N.E.2d 1016, 1018 (1986). The fact of this conviction may be used against a defendant in a later civil proceeding. <u>Gerdes</u>, 148 Ill. App. 3d at 648, 499 N.E.2d at 1018 (for purpose of revoking driver's license, the

court properly considered defendant's driving-under-the-influence conviction resulting from nolo contendere plea in Georgia).

This is an important distinction.  For example, in Gerdes, a driver who pleaded nolo contendere under the laws of Georgia to driving under the influence of liquor was convicted of an offense.  Gerdes, 148 Ill. App. 3d at 647, 499 N.E.2d at 1017. We found the Illinois Secretary of State could consider the fact of the defendant's conviction for purposes of revoking the defendant's driver's license.  Gerdes, 148 Ill. App. 3d at 648, 499 N.E.2d at 1018.  Similarly, in In re Eaton, 14 Ill. 2d 338. 339, 152 N.E.2d 850 (1958), an attorney who pleaded nolo conten- dere to a federal crime for using the mails to defraud was convicted of an offense.  The supreme court held the Chicago Bar Association and the Supreme Court of Illinois could consider the fact of the defendant's conviction for purposes of considering his disbarment.  Eaton, 14 Ill. 2d at 342, 152 N.E.2d at 852.

In each of those instances, the fact of conviction is admissible in a later proceeding, but the facts and circumstances underlying the conviction are not.  Neither party has cited nor have we found any case where the nolo contendere plea has been admitted to prove the facts of the underlying offense or wrongdo- ing.  For example, a driving-under-the-influence-of-alcohol conviction in Georgia cannot be used to prove a defendant drove under the influence of alcohol at a later time in Illinois.

The facts given in limiting instruction during the evidence portion of the case went beyond the nolo contendere plea

itself.  While the nolo contendere plea was ostensibly admitted for the limited purpose of showing motive, opportunity, common plan or design, or absence of mistake or accident, in reality it served to impermissibly demonstrate the wrongdoing at issue in this case.

We also note section 16(a) of the Clayton Act (15 U.S.C. §16(a) (2006)) expressly provides consent judgments in anti-trust actions, such as price-fixing, are not prima facie evidence against a defendant, and federal courts have held judgments entered on pleas of nolo contendere are within this exclusion.  Commonwealth Edison Co. v. Allis-Chalmers Manufacturing Co., 323 F.2d 412, 417 (7th Cir. 1963).

A 1948 conviction via a nolo contendere plea to conspiracy to fix prices with other companies in the sale of brake linings is not evidence of a different conspiracy involving the health and safety of workers exposed to asbestos.  The trial court abused its discretion and erred by admitting the plea and judgment of conviction and surrounding circumstances in the context of this case, and the court exacerbated the error by the limiting instruction given during the evidence portion of the case.

### 2. E.A. Martin Letter

Defendant contends the letter was inadmissible hearsay because an out-of-court statement by a corporate employee is not admissible as an admission of the corporation unless (1) the person who made the statement was an employee or agent of the

corporation, (2) the statement made was about a matter over which the employee had actual or apparent authority, and (3) the employee spoke under or by virtue of his authority as an agent or employee. Roberts v. Norfolk & Western Ry. Co., 229 Ill. App. 3d 706, 713-14, 593 N.E.2d 1144, 1150 (1992).

Defendant contends nothing showed Martin, an employee of Bendix who died in 1967, had actual or apparent authority over any issue with respect to the health and safety of Bendix's employees or that his comment was made under that authority. Bendix had employees with authority over such matters, but no evidence was presented which suggested they approved or ratified Martin's letter. All Bendix or Honeywell witnesses disavowed the letter as a personal, distasteful remark by Martin never representing the views of Bendix or Honeywell. The comments in the Martin letter were of a different nature than information about the amount of products needed, potential supply problems, etc., which would fall within the normal scope of authority of a purchasing director. Martin's letter was not an admission by Bendix and was not admissible on the issue of notice. See Thomas v. Borgsmiller, Inc., 155 Ill. App. 3d 1057, 1060-61, 508 N.E.2d 1235, 1237 (1987) ("[k]nowledge of an agent can be imputed to the principal only when it relates to facts within the scope of the agency").

A large part of Martin's job as the purchasing director at the Troy plant, one of two Bendix brake plants, was to procure asbestos, an important component in the manufacture of brake

- 21 -

shoes, from J-M, the major, if not only, supplier of asbestos to Bendix.  Martin had authority to purchase asbestos, and Bendix's brake linings, which were dependent on this product, were a large part of its manufacturing output.  Martin had authority over the specific product discussed in the letter, asbestos.  Use of asbestos and, hence, the amount purchased, could be effected by any adverse health effects surrounding asbestos exposure.  Hence, Martin could have been interested in the issue of the health and safety effects of the use of asbestos.

However, simply because Martin was interested in what Chemical Week magazine had to say about asbestos and shared in the letter both his interest in the subject with Hendry, the sales manager at J-M, and their apparent mutual skepticism over the dangers of asbestos exposure, does not make Martin a spokesperson for Bendix on the subjects of health, safety, and asbestos exposure.  The letter is no more than a note from one business acquaintance to another and not an expression of corporate policy or proof of any conspiracy.  Nothing in the record establishes (1) Martin had any responsibility for health or safety, (2) his position in the company gave him authority to espouse policy on health and safety, or (3) anyone at Bendix ratified the letter or endorsed his attitude.

This letter is a revealing historical anecdote that may give us insight into the thinking within the asbestos industry in 1966, but it was irrelevant.  A persuasive argument can also be made that even if it had some modest relevance, it was inflamma-

tory, and whatever probative value it had was outweighed by its prejudicial effect.

### 3. Admission of Evidence of Activities of Alleged Coconspirators

Defendant contends the bulk of plaintiff's documentary evidence, as well as much of the testimony of Dr. Castleman pertaining to the activities of the alleged coconspirators, was hearsay. Before statements of a coconspirator are admissible as an exception to the hearsay rule, there must be some independent evidence apart from the statements themselves to establish a conspiracy, although the independent evidence may be circumstantial in that the agreement which forms the essence of the conspiracy may be inferred from all the surrounding facts and circumstances. Gas Power, Inc. v. Forsythe Gas Co., 249 Ill. App. 3d 255, 262, 618 N.E.2d 959, 965 (1993); People v. Eddington, 129 Ill. App. 3d 745, 771-72, 473 N.E.2d 103, 121 (1984). Defendant objected to the admission of the hearsay evidence absent independent, nonhearsay evidence establishing Bendix had an agreement with the alleged coconspirators to misrepresent or suppress information about asbestos.

Taken together, the surrounding facts and circumstances are not enough to support proof of conspiracy. Bendix and J-M maintained a longtime relationship. However, we have determined the Martin letter was not admissible, and absent the inferences plaintiff sought to emphasize because of that letter, it appears Bendix and J-M had the expected relationship of purchaser and supplier. We have also concluded the prior nolo contendere plea,

conviction, and surrounding circumstances involving conspiracy between Bendix and several of the current alleged coconspirators involving asbestos and brake linings was not admissible. That leaves us with a common trade-organization membership and a common director between J-M and Bendix. This offered the opportunity to share information and overall business strategies. These facts do not constitute independent proof of a conspiracy, and they are not enough to support admission of evidence regarding the behavior of other companies.

Defendant makes a separate argument concerning the admission of evidence regarding the activities of O-I and OC as coconspirators. It contends O-I and OC previously have been found as a matter of law not to be conspirators in this same alleged conspiracy. Thus, any evidence of the activities of those two companies was inadmissible as nothing showed Bendix had any contacts at all with O-I or OC, let alone conspiratorial contacts. Defendant argues evidence concerning the activities of OC and O-I should be excluded and cites as support our supreme court's decision in McClure, where evidence was presented in an attempt to establish O-I and OC were involved in the same alleged conspiracy as that alleged here. McClure, 188 Ill. 2d at 153-54, 720 N.E.2d at 268. Defendant further contends the same evidence in McClure was found insufficient to show O-I and OC to be coconspirators by this court in Burgess v. Abex Corp., 311 Ill. App. 3d 900, 725 N.E.2d 792 (2000).

Defendant has misinterpreted both McClure and Burgess.

In McClure, the supreme court found, based on the evidence in that record, not as a matter of law, insufficient evidence existed of contacts of OC and O-I with J-M and Unarco to establish a conspiracy. McClure, 188 Ill. 2d at 147, 720 N.E.2d at 264. The court found (1) more than parallel conduct was needed to show a conspiracy and (2) the evidence offered in that case was not sufficient to infer a conspiracy existed. McClure, 188 Ill. 2d at 146, 720 N.E.2d at 264. As noted in our decision in Burgess, based on McClure, plaintiff should be permitted to provide additional evidence indicating O-I and OC were members of the conspiracy and ordered a new trial for that purpose. Burgess, 311 Ill. App. 3d at 904, 725 N.E.2d at 796.

Plaintiff presented evidence Unarco and J-M had been suppliers to O-I throughout the 1940s and 1950s. This evidence was not in McClure. It is contrary to what O-I represented to the supreme court in McClure and is at odds with that court's determination of isolated contacts between those companies. McClure, 188 Ill. 2d at 151, 720 N.E.2d at 267. Further evidence included documents showing OC used asbestos sold by J-M and also sold J-M products by rebranding them as its own asbestos products. These sales occurred at a time when each company possessed knowledge asbestos was dangerous but failed to warn of the dangers. Additional exhibits not part of the McClure record concerning O-I showed the company experienced a tenfold increase in sales in its asbestos products in the years immediately after receiving the results of a Saranac study commissioned by O-I and

- 25 -

OC detailing the hazards in the asbestos products O-I and OC were manufacturing and distributing.

Defendant contends this evidence is merely additional to that presented in McClure in a quantitative sense and not a qualitative one. The question as to whether the additional evidence was enough to prove a conspiracy on their part does not effect the admissibility of the evidence.

### 4. Evidence of Trial or Deposition Testimony From Cases Where Defendant Was Not a Party

Plaintiff introduced the former testimony of witnesses given in depositions or at trials in other cases. Defendant objected to the admission of the former testimony through a motion in limine prior to trial because nothing showed defendant was a party to those other cases or its interests were protected.

Former testimony is not admissible unless it is established the witness is unavailable, the action involved the same issue between the same parties or their privies, and the party against whom the testimony is offered had full opportunity to cross-examine the witness in the prior proceedings. George v. Moorhead, 399 Ill. 497, 500-01, 78 N.E.2d 216, 218 (1948). However, the identity-of-the-parties requirement may not be strictly enforced as long as the party against whom the evidence is offered had full opportunity to test the veracity of the former testimony through cross-examination, such as where testimony at a defendant's criminal trial is sought to be introduced at a civil trial against the same defendant. See Laboy v. Industrial Comm'n, 74 Ill. 2d 18, 21-22, 383 N.E.2d 954, 956

(1978).

Where the choice is between having testimony by way of deposition or prior trial testimony and having no testimony, this court has noted the identity-of-the-parties requirement should be relaxed further to allow the introduction of former testimony even if a party against whom the evidence is offered was not a party to the prior proceedings if "the interests of the party against whom the deposition is sought to be admitted were protected by the presence of a party at the deposition with the opportunity and a similar motive to develop testimony." McClure v. Owens Corning Fiberglas Corp., 298 Ill. App. 3d 591, 603, 698 N.E.2d 1111, 1119 (1998).

In its order denying defendant's motion in limine, the trial court stated it would look at each prior deposition or transcript when it was offered into evidence to determine if defendant's interests were protected. Defendant claims no one present in the prior cases was motivated to protect its interests. Defendant ignores the purposes for which the prior testimony was given.

Most of the testimony offered was for the purpose of showing parallel conduct by alleged coconspirators and not for the purpose of proving conspiracy. One example cited by both parties is the prior testimony of Wilbur Ruff, which was offered on only one issue: the misconduct of J-M in the way it treated its employees while taking in-house X-rays. Attorneys for J-M were present at Ruff's deposition, and no one would have been

more motivated than J-M to establish Ruff was lying when he stated J-M took chest X-rays and failed to inform employees of the presence of disease. Ruff's testimony did not go to the ultimate issue of conspiracy but to the issue of parallel conduct by J-M in possessing knowledge of the connection between asbestos exposure and disease and not informing its employees.

Defendant disagrees with plaintiff's description of J-M as "motivated" and argues no party at the prior proceedings had a motive similar to defendant--to elicit testimony of Bendix's noninvolvement in any activities or conduct that was the subject of the witness's testimony. Such a motive on the part of defendant is inconsequential to this case, however, as the fact a conspirator did not actively participate in every act done in furtherance of the conspiracy does not absolve that conspirator from liability. See Adcock v. Brakegate, Ltd., 164 Ill. 2d 54, 65, 645 N.E.2d 888, 894-95 (1994).

Defendant argues even under a relaxed standard, however, no basis exists for the admission of former testimony because plaintiff made no attempt to show witnesses were actually "unavailable." Defendant contends to show a witness is unavailable, the party seeking to introduce the prior testimony has the burden of proving the steps taken "to secure the presence of the missing witness at trial were made in good faith and with due diligence" (People v. Rogers, 79 Ill. App. 3d 745, 747-48, 398 N.E.2d 1058, 1060 (1979)), and a claim of unavailability must be supported by affidavit or testimony (Curt Bullock Builders, Inc.

v. H.S.S. Development, Inc., 261 Ill. App. 3d 178, 182, 634
N.E.2d 751, 754 (1994)).

In this case, some of the witnesses who gave prior
testimony were deceased.  In other cases, their unavailability
was shown by testimony in the transcripts sought to be admitted
that the witnesses were nonresidents of the State of Illinois;
therefore, in such circumstances, continued unavailability is
presumed, and the burden shifts to the opponent to show a change
of residence.  See Laird v. Illinois Central Gulf R.R. Co., 208
Ill. App. 3d 51, 77, 566 N.E.2d 944, 959-60 (1991).

The trial court did not abuse its discretion in admit-
ting evidence via prior deposition or trial testimony.

5. Defendant's Membership in Trade Organizations

Defendant argues evidence of Bendix's membership and
involvement in trade organizations such as BLMA and FMSI should
not have been admitted and doing so violated Bendix's right to
freedom of association.  Defendant contends evidence of Bendix's
trade-association activity had only one purpose--confusing the
jury and prejudicing Bendix.

Membership and involvement in a trade organization, by
itself, does not support an inference of involvement in a con-
spiracy (see McClure, 188 Ill. 2d at 149, 720 N.E.2d at 266), but
it is not inadmissible because such evidence, taken together with
other evidence, may lead to an inference of the existence of a
conspiracy.

The BLMA, of which Bendix was a member, is a trade

organization in which its members (some of whom are alleged to be in the conspiracy in this case), as well as the organization itself, were convicted of a conspiracy to fix prices on brake materials containing asbestos.  We have concluded the nolo contendere plea by Bendix was not admissible.  While evidence of trade organization membership itself does not give rise to an inference of conspiracy, it may still be relevant to prove a relationship among the companies alleged as coconspirators.  Membership in FMSI is relevant because (1) the trade organization's direct predecessor and many of its members are the same and (2) it shows the continuing relationship between the alleged coconspirators.  Defendant's freedom to associate does not mean it can prevent evidence of membership and activities of the association from being admitted in trials against it.  No evidence in this case shows either FMSI or AIA engaged in any illegal activity or bad conduct.  However, evidence of Bendix's membership was relevant to show its relationship with the other members and the opportunity it had to coordinate activities.

We conclude the admission of the nolo contendere plea and judgment of conviction, coupled with the limiting instruction and the admission of the E.A. Martin letter, deprived Honeywell of a fair trial.  We choose to address several additional issues concerning the admissibility of certain evidence because those issues may arise at a new trial.

We need not address the issues raised involving jury instructions, or the trial court's response to a jury question.

The jury instructions at a new trial may be different and will be intertwined with the evidence that is admitted. Any question coming from the jury will also be different.

## B. Judgment N.O.V.

Defendant contends this case should not have been allowed to go to the jury on plaintiff's conspiracy claim because (1) no evidence was presented to show an agreement by Bendix to assert asbestos was safe or to suppress information about the dangers of asbestos, much less the clear and convincing evidence necessary to prove the existence of such an agreement, and (2) the evidence showed the acts taken by Bendix in response to the dangers of asbestos were taken independently from or contrary to those taken by the alleged coconspirators.

The standard of review for the denial of a motion for judgment n.o.v. is de novo. McClure, 188 Ill. 2d at 132, 720 N.E.2d at 257. A defendant is entitled to a motion for judgment n.o.v. only when the evidence, viewed in the light most favorable to the plaintiff, so overwhelmingly favors the defendant that a contrary verdict cannot stand. Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). In reviewing a motion for judgment n.o.v., a court cannot reweigh the evidence and set aside a verdict because different conclusions could have been drawn. Maple v. Gustafson, 151 Ill. 2d 445, 452, 603 N.E.2d 508, 512 (1992). To recover under a theory of civil conspiracy, a plaintiff must prove an agreement and a tortious act committed in furtherance of that agreement.

McClure, 188 Ill. 2d at 133-34, 720 N.E.2d at 258. The agreement must be knowingly and intentionally made. McClure, 188 Ill. 2d at 133, 720 N.E.2d at 258. However, a defendant who understands the general objectives of the conspiracy, accepts them, and agrees either explicitly or implicitly to further those objectives is liable as a conspirator. Adcock, 164 Ill. 2d 64, 645 N.E.2d 894.

A conspiracy is almost never susceptible to direct proof, but it may be proved by circumstantial evidence and inferences from evidence. Because it may be proved by inference and circumstantial evidence, that evidence must be clear and convincing. McClure, 188 Ill. 2d at 134, 720 N.E.2d at 258.

The supreme court in McClure held parallel conduct may serve as circumstantial evidence of an agreement under a civil conspiracy theory but it does not, of itself, constitute clear and convincing evidence of that agreement. McClure, 188 Ill. 2d at 142, 720 N.E.2d at 262. The McClure court found the evidence, in addition to parallel conduct, was not clear and convincing an agreement existed to suppress information concerning the harmful effects of asbestos exposure or to falsely represent it was safe to work in close proximity to asbestos-containing material. McClure, 188 Ill. 2d at 147, 720 N.E.2d at 264. Defendant maintains the additional circumstantial evidence in this case on which plaintiff relied to establish an agreement between Bendix and the other alleged coconspirators was less than that found insufficient in McClure.

Direct evidence of an agreement involving Bendix was not presented as it was for many of the other alleged coconspirators. As for an agreement between the other coconspirators, defendant does not contest that one did exist between many of them, although it contends no such evidence existed for finding OC and O-I were parties to the agreement. Any evidence an agreement existed between Bendix and any of the alleged coconspirators was circumstantial or based on inference.

Evidence of parallel conduct between the alleged coconspirators and Bendix was shown. It was obvious the coconspirators knew of the hazards of asbestos at least by the 1940s through the Saranac studies. The jury could reasonably infer Bendix possessed knowledge much earlier than the 1970s that asbestos dust was hazardous based on the following: (1) Charm's admission Bendix must have known of hazards at least by the 1950s, in light of (a) Bendix taking chest X-rays of its employees and (b) having a dust-control system in place from the 1950s on, and (2) Bendix admitting it was "well-versed" in asbestos. Yet Bendix, like J-M, Unarco, and Raybestos, gave no information to its employees until some time in the 1970s.

Evidence beyond parallel conduct was presented. J-M was the exclusive supplier of asbestos fiber to Bendix for many decades. Despite this long-standing relationship, defendant contends no correspondence pertaining to this relationship exists other than Martin's letter in 1966. We have found the Martin letter to be inadmissible.

However, J-M assisted Bendix with a position paper on asbestos in the late 1960s. At this time, neither Bendix nor J-M placed labels on its products stating asbestos could cause cancer despite J-M having such knowledge dating back to the 1930s.

Also, plaintiff presented evidence concerning Bendix's membership in the BLMA and the FMSI. In addition to Bendix, J-M, Raybestos, and Abex were members of these trade organizations. As we earlier noted, in 1948, all of these companies, as well as others, were convicted of participating in a price-fixing conspiracy for brake linings, the products containing asbestos at issue in this case. However, the <u>nolo</u> <u>contendere</u> plea by Bendix is inadmissible. Thus, it cannot be used, as it was used in this case, as evidence of a closer relationship between these companies than the typical business relationship.

Bendix and J-M also shared a common director. The significance of this fact is these companies, in addition to being supplier and client, were competitors in the sale of asbestos-containing brake linings during the years 1959 to 1967. Boards of directors for companies plan long-term strategy and have responsibility for important decisions affecting corporations. For these reasons, under the Clayton Act, interlocking directors are not permitted in two or more corporations if they are competitors. See 15 U.S.C. §19 (2006); <u>Protectoseal Co. v. Barancik</u>, 484 F.2d 585, 589 (7th Cir. 1973). This prohibition is a recognition interlocking directors implies a relationship is not at "arm's length."

We conclude the evidence, when viewed in a light most favorable to plaintiff, does not so overwhelmingly favor defendant that the jury's verdict in favor of plaintiff could never stand. See Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). Thus, we reverse and remand for a new trial.

C. Return of Documents Produced in Discovery

During pretrial discovery, the trial court allowed plaintiff, over defendant's objection, to take the deposition of David Cote, defendant's chairman, president, and chief executive officer. On August 12, 2005, six days before Cote's scheduled deposition and one month before trial, plaintiff served the following production request:

"[A]ll documents received by, or authored by, [Cote] in connection with his employment by [Honeywell] or any corporate predecessor of [Honeywell], in which the subject matters included or referenced asbestos, its effect on human health, asbestos litigation, the past or present activities of [Honeywell] or any of its corporate predecessors in regard to the manufacture, distribution or sale of asbestos or asbestos-containing products, or interaction between [Honeywell], or any of its corporate predecessors, and any other corporate entity in regard to asbestos or its

- 35 -

effect on human health ***."

At Cote's deposition, defendant objected to the production request to the extent it sought documents in Cote's files pertaining to defendant's post-2002 lobbying advocacy efforts concerning proposed federal asbestos-litigation-reform legislation. Defendant argued these "lobbying documents" were privileged under the first amendment as well as common-law attorney-client and confidentiality privileges. At his deposition, Cote testified over the previous two years he had met with and spoken to various members of Congress with respect to pending federal legislation concerning asbestos litigation. He also testified he had met and communicated with various officers of other companies during and after 2003 regarding advocacy efforts on the pending federal legislation. The only file he had referencing asbestos or asbestos litigation related to the proposed federal legislation.

After the deposition, defendant produced a privilege log itemizing each document contained in Cote's file and documenting each privilege asserted for that document. Plaintiff responded with a motion to compel, which the trial court granted, except for those documents which demonstrated on their face the applicability of the attorney-client privilege. The court further ordered "except for their use within legal proceedings in this case, [p]laintiff and her counsel shall not disseminate the [lobbying documents] being produced or their content, to any third party without obtaining further order of the [c]ourt."

Plaintiff did not offer any of the "lobbying documents" at trial. Cote was called to testify, but neither he nor any other witness was asked any questions about the post-2002 lobbying efforts. After trial, defendant moved for an order compelling plaintiff to return the "lobbying documents," which the trial court denied.

The trial court shielded from discovery any documents covered by attorney-client privilege. The remaining documents apparently dealt with communications between companies affected by asbestos litigation concerning how they should lobby Congress and what arguments they should make in order to obtain asbestos litigation reform legislation. No relationship exists between these documents and the cases cited by defendant protecting disclosure of membership in minor political parties and the confidentiality of discussions of a school board concerning union negotiations.

Defendant contends the documents should be returned because they are not relevant to this case. The fact the documents were not introduced into evidence in this case does not mean they were not helpful in obtaining relevant evidence which was introduced. Further, the materials Cote received discussing asbestos and its health effects were relevant themselves as they go directly to defendant's claim Cote knew nothing about asbestos. To the extent the documents show Cote's knowledge of asbestos, they are relevant.

In the supreme court rules, nothing requires the return

of documents produced during discovery.  Further, at the time defendant presented the trial court its motion to return the documents, this case was not over as seen by this appeal.  A new trial has been ordered, and the documents may still be used by plaintiff, so plaintiff may keep them.

As for any other cases, plaintiff's counsel is already under a court order requiring court permission to use the documents in any other case.  The repetitive nature of asbestos litigation is well-known.  The same parties, witnesses, and lawyers appear in many cases.  Cote's appearance may be ordered in later cases.  Should plaintiff's counsel obtain the required court permission in another case, counsel would not then be required to re-obtain the documents in each case, an impractical and unnecessary step.  Finally, return of the documents may make their reconstruction for further cases impossible.

The trial court's order requiring court permission to use the produced documents protects defendant from public dissemination of the documents.  Thus, the trial court did not err in denying defendant's motion to return the documents.

### III. CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed and remanded for a new trial.

Reversed and remanded.

APPLETON, P.+J., and TURNER, J., concur.